## Alexandria

ROBIN DEAN SNURKOWSKI

v.

COMMONWEALTH OF VIRGINIA

No. 0203-85

Decided July 15, 1986

COUNSEL

Ferris B. Wafle, for appellant.

Jerry P. Slonaker, Senior Assistant Attorney General (Mary Sue Terry, Attorney General; Donald R. Curry, Assistant Attorney General, on brief), for appellee.

534

Opinion

## ON PETITION FOR REHEARING*

COLE, J.—This appeal raises two issues: (1) whether the trial court abused its discretion in refusing to grant appellant's motion made on the morning of the trial for another psychological evaluation of the appellant; and (2) whether the appellant was denied due process of law by the trial court's failure to appoint a psychiatrist to conduct an appropriate examination and assist in evaluating, preparing, and presenting his defense.[1] We decide both of the issues in the negative and affirm.

The appellant, Robin Dean Snurkowski, was charged with the June 24, 1984, robbery of the Oshell Texaco Station in Spotsylvania County, Virginia. On August 23, 1984, a preliminary hearing was held and the case was certified to the grand jury, which, on October 15, 1984, indicted the appellant upon the charge of robbery. On October 25, 1984, he was convicted by a jury and his punishment fixed at life imprisonment. He was sentenced accordingly and this appeal followed.

On July 12, 1984, upon motion of the appellant's attorney, the judge of the Spotsylvania General District Court entered an order appointing Rappahannock Area Mental Health Services to make a psychological evaluation of the appellant to determine: (1) his capacity to stand trial; and (2) his mental state at the time of the offense. The evaluation was made by Dr. Roger J. Pasternak, Ph.D., a licensed clinical psychologist, and Mary McGhee, a psychologist with a master's degree. Their written report filed with the court concluded that the appellant had no mental illness at the time of the robbery and that he was a malingerer; that he was in no apparent need of treatment; that the appellant had the capacity to understand the proceedings against him and could assist in his defense; that it was extremely unlikely that he would choose to cooperate with his attorney; and that he might disrupt courtroom

---

* By order dated April 10, 1986, a petition for rehearing in this matter was granted. By order dated July 15, 1986, the opinion issued March 18, 1986 (2 Va. App. 101, 341 S.E.2d 667), was vacated and a new opinion, as modified, was issued.

[1] The petition for appeal was granted on a third issue: whether the failure to determine Snurkowski's mental state at the time of the offense effectively deprived him of due process. This issue was withdrawn by appellant in his brief prior to argument before this Court.

procedure during his trial.

On the morning of the trial, after arraignment, counsel for the appellant moved the court for a continuance so that another psychological evaluation could be performed. Counsel stated that a second psychological evaluation was required because he had received a report dated October 3, 1983, from the Connecticut Mental Health Center, which had not been considered by Dr. Pasternak. The court denied the motion, and this ruling constitutes the basis of the first issue raised by the appellant.

The court questioned Mary McGhee, one of the psychologists who made the original Rappahannock Area Mental Health Services evaluation. She was asked by the court if the Connecticut Mental Health Center's report dated October 3, 1983, would cause her to reconsider the determination and report which she had submitted with Dr. Pasternak. She responded that the information in the report would not cause her to change her opinion. Later during the trial Dr. Pasternak testified that there was no information in the Connecticut report that would make any difference to him in forming his opinion in the case.

The grant or denial of a continuance lies within the sound discretion of the trial judge. *Quintana* v. *Commonwealth*, 224 Va. 127, 135, 295 S.E.2d 643, 646 (1982). The appellant has shown no prejudice resulting from what he claims was an abuse of discretion, as both psychologists stated that the Connecticut report would not have changed their opinion of the appellant's mental state. We affirm the trial court's ruling. *Rosenberger* v. *Commonwealth*, 159 Va. 953, 957, 166 S.E. 464, 465 (1932).

The appellant claims that in light of *Ake* v. *Oklahoma*, 105 S.Ct. 1087 (1985), he was denied due process of law in that no psychiatrist was appointed to examine him, to help him prepare his case, to serve as an expert witness for the defense, and to assist in the defense at trial. *Ake* was decided in the Supreme Court of the United States on February 26, 1985. Since the present case was decided by a jury on October 25, 1984, and the court sentenced the appellant on that same day, the court did not have the benefit of the *Ake* decision for the purpose of determining its obligation to provide state funded psychiatric assistance for the

defense.

At the outset, it is appropriate to acknowledge that there is uncertainty as to whether *Ake* is to be applied in non-capital cases. In his concurring opinion, Chief Justice Burger stated, "[I]n capital cases the finality of the sentence imposed warrants protections that may or may not be required in other cases. Nothing in the Court's opinion reaches non-capital cases." *Id.* at 1099. While this language lends support to the position that *Ake* is limited in its application to capital cases only, we need not reach that issue in this case because the appellant's contentions are more appropriately addressed on other grounds.[2]

At trial, appellant made no specific motion for the trial court to appoint a psychiatrist for the defense. Rule 5A:18 of this Court states that error will be sustained to a ruling of the trial court only when the objection was stated, together with the grounds therefor, at the time of the ruling, except for good cause shown or to enable the Court of Appeals to attain the ends of justice. *Ingram* v. *Commonwealth*, 1 Va. App. 335, 341, 338 S.E.2d 657, 660 (1986); *Royal* v. *Commonwealth*, 2 Va. App. 59, 62, 341 S.E.2d 660, 662 (1986). The futility of presenting an objection to the state courts cannot alone constitute cause for a failure to object at trial. *See Engle* v. *Isaac*, 456 U.S. 107, 131 (1982). Accordingly, appellant's claim is barred under Rule 5A:18. On additional grounds, we also conclude that the appellant does not benefit from the *Ake* decision.

We find no reference in *Ake* to the question of the retroactivity of the principle that a criminal defendant in certain cases is entitled to the services of a private psychiatrist at state expense. We must, therefore, look to other cases to determine whether *Ake* applies to cases decided prior to the date of that decision.

The pre-1965 requirement that all constitutional rules receive full retroactive application was derived from the Blackstonian no-

---

[2] *Ake* also makes it clear that the constitutional rule announced therein is premised on the accused first making a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial. Because of our ruling on the issue of the retroactivity of the Ake decision, we do not reach the issue whether appellant made such a showing in this case.

tion "that the duty of the court was not to 'pronounce a new law, but to maintain and expound the old one.' " *Linkletter* v. *Walker*, 381 U.S. 618, 622-23 (1965) (citing 1 Blackstone, Commentaries, 69 (15th ed. 1809)).

For many years, the leading case which controlled the question of retroactive application of constitutional rules was the *Linkletter* case. *Linkletter* addressed the question whether the exclusionary rule of *Mapp* v. *Ohio*, 367 U.S. 643 (1961), was to be applied retroactively to cases that had become "final" prior to the date of decision. By "final" decision, the Court meant cases where the judgment of conviction had been rendered, direct appeals exhausted, and the time for petition for certiorari had elapsed before the *Mapp* decision was announced. *Linkletter*, 381 U.S. at 622. The Court in *Linkletter* extensively reviewed the history of the term "retrospective" and the decisions that had considered the principle, and concluded that the United States Constitution neither prohibits nor requires retrospective effect, finding that the Constitution simply "has no voice upon the subject." *Id.* at 629. The Court stated:

> Once the premise is accepted that we are neither required to apply, nor prohibited from applying, a decision retrospectively, we must then weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation.

*Id.*

Applying these principles, the Supreme Court held that the *Mapp* decision should not apply to convictions that had become final before *Mapp* was decided. *A fortiori*, those defendants whose convictions were not "final" prior to the date of the *Mapp* decision received the benefit of the decision even though their trials were complete prior to the date of the ruling. For the next twenty years, the Supreme Court applied the *Linkletter* principles to a variety of constitutional decisions. Some decisions were given full retroactive application; others were given either limited or no retroactive effect.

In *United States v. Johnson*, 457 U.S. 537 (1982), Justice Blackmun commented that in a consistent stream of separate opinions since *Linkletter*, members of the Court had argued against selective awards of retroactivity. He stated that "[t]hose opinions uniformly have asserted that, at a minimum, all defendants whose cases were still pending on direct appeal at the time of the law-changing decision should be entitled to invoke the new rule." *Id.* at 545. In *Desist* v. *United States*, 394 U.S. 244, 256 (1969) (dissenting opinion), and *Mackey* v. *United States*, 401 U.S. 667, 675 (1971) (concurring and dissenting opinion), Justice Harlan presented an argument in support of the principle that failure to apply a newly declared constitutional rule at least to cases not yet "final" at the time of the decision violated several norms of constitutional adjudication. As a result of these criticisms, the Court decided to rethink "retroactivity." *United States v. Johnson*, 457 U.S. at 548.

The issue in *Johnson* was whether the rule announced in *Payton* v. *New York*, 445 U.S. 573 (1980), applied to an arrest that occurred before the *Payton* case was decided. In *Payton*, the Supreme Court held that the Fourth Amendment prohibits the police from making a warrantless and nonconsensual entry into a suspect's home to make a routine felony arrest. 445 U.S. at 576.

The Supreme Court reviewed its decisions pertaining to the retroactive effect of constitutional holdings beginning with *Linkletter*, and established guidelines to determine whether a new ruling with regard to constitutional issues is to be applied retroactively in Fourth Amendment cases. The Court stated:

We therefore hold that, subject to the exceptions stated below, a decision of this Court construing the Fourth Amendment is to be applied retroactively to all convictions that were not yet final at the time the decision was rendered.

By so holding, however, we leave undisturbed our precedents in other areas. First, our decision today does not affect those cases that would be clearly controlled by our existing retroactivity precedents. Second, because respondent's case arises on direct review, we need not address the retroactive

reach of our Fourth Amendment decisions in those cases that still may raise Fourth Amendment issues on collateral attack. . . .Third, we express no view on the retroactive application of decisions construing any constitutional provision other than the Fourth Amendment.

*United States* v. *Johnson*, 457 U.S. at 562.

It is obvious that to apply these guidelines to an actual factual situation, one must know the reach of the first exception referred to as "those cases that would be clearly controlled by our existing retroactivity precedents." The Court addressed this issue. It stated that an examination of the post-*Linkletter* decisions convinced them that in three narrow categories of cases, the answers to the retroactivity questions have been determined by application of a threshold test, and not by application of the *Linkletter* principles. The three categories are:

*First*: When a decision of the Supreme Court merely applies settled precedents to new and different factual situations, the decision is given full retroactive effect, i.e., it applies even to those decisions that are finalized.

*Second*: Where the Supreme Court has expressly declared a rule of criminal procedure to be "a clear break with the past," the decision is applied only prospectively, i.e., it applies only to those cases where the wrong complained of occurred after the date of the decision. Once the court has found that the new rule was unanticipated, the second and third *Linkletter* factors—reliance by law enforcement authorities on the old standard and effect on the administration of justice of a retroactive application of the new rule—have virtually compelled a finding of nonretroactivity.

*Third*: The Court has recognized full retroactivity as a necessary adjunct to a ruling that a trial court lacked authority to convict or punish a criminal defendant in the first place. *Id*. at 549-50.

The Supreme Court found that *Payton* did not fit into any of the three categories. It did not simply apply settled precedent to a new set of facts. It did not announce an entirely new and unantici-

pated principle of law, nor did it overturn a long-standing practice approved by a near unanimous body of lower court authority. Finally, the case did not hold that the trial court lacked authority to convict or sentence the accused. Having determined that the retroactivity question was not controlled by prior precedents, the Court held that *Payton* would be applied retroactively to all cases still pending on direct appeal at the time *Payton* was decided.

Following the *Johnson* decision, two additional cases have been decided by the United States Supreme Court that warrant consideration. The first is *Solem* v. *Stumes*, 465 U.S. 638 (1984). Stumes, a homicide suspect, made incriminating statements to the police about the homicide after the police had twice renewed his interrogation despite the fact that Stumes had invoked his right to counsel. The trial court refused to suppress the statements and convicted him of first degree manslaughter. The South Dakota Supreme Court affirmed. Stumes then filed a petition for a writ of habeas corpus in the District Court, which denied the writ. An appeal was taken to the Court of Appeals and while Stumes' appeal was pending the Supreme Court decided *Edwards* v. *Arizona*, 451 U.S. 477 (1981), which held that once a suspect has invoked his right to counsel, subsequent questioning by the police is prohibited except when communication is initiated by the suspect. The Court of Appeals applied *Edwards* to Stumes' case, found that the interrogation that the police conducted was unconstitutional and reversed the District Court. The Supreme Court reversed the Court of Appeals and held that *Edwards* should not have been applied retroactively to Stumes' case. Instead of following the Fourth Amendment rule on retroactivity established in *United States* v. *Johnson*, the Court went back to the earlier cases and stated:

> The basic principles of retroactivity in criminal cases were established in *Linkletter* v. *Walker, supra, Tehan* v. *Shott*, 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966), and *Johnson* v. *New Jersey*, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed. 882 (1966). Under these cases,
>
>> "[t]he criteria guiding resolution of the [retroactivity] question implicate (a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the

effect on the administration of justice of a retroactive application of the new standards."

465 U.S. at 642-43 (citation omitted).

The Court then found that the *Edwards* rule did not go to the heart of the truth-finding function, a factor which the Court has consistently held to be controlling on the question of retroactivity. With regard to the reliance factor, the Court found that *Edwards* was not a "clear break with the past," a factor that almost always leads to a finding of nonretroactivity, but that "*Edwards* established a bright-line rule to safeguard preexisting rights, not a new substantive requirement." *Id*. at 646. However, the Court concluded that the police could *not* be faulted if they did not anticipate the *Edwards* rule, as the decision in *Edwards* could not have been "clearly" or "distinctly" foreshadowed. *Id*. at 649. For this reason, the Court held that the *Edwards* decision would not be applied retroactively, and that, "[a]t a minimum, nonretroactivity means that a decision is not to be applied in collateral review of final convictions. For purposes of this case, that is all we need decide about *Edwards*." *Id*. at 650.

The second case decided since Johnson is *Shea* v. *Louisiana*, 105 S.Ct. 1065 (1985). Shea was arrested on armed robbery charges and taken to the police station for questioning by detectives. Upon being read his *Miranda* rights, he stated that he did not wish to make any statement until he saw a lawyer. The interview terminated. The next day, before Shea had seen a lawyer, one of the detectives asked him if he was willing to talk about the case. After his *Miranda* rights were again read to him, Shea orally confessed to the robberies. His statements were admitted in evidence at his trial in 1980, and he was convicted. While his case was pending on direct appeal to the Louisiana Supreme Court, the United States Supreme Court decided *Edwards* v. *Arizona*. While acknowledging an *Edwards* violation, the Louisiana Supreme Court held that since the incident occurred before the decision in *Edwards* was rendered, it did not apply to Shea's case. The United States Supreme Court granted certiorari. The sole question for decision was whether the *Edwards* decision applied to Shea's case, a case, unlike *Stumes*, that was still on direct appeal in the state system at the time *Edwards* was decided.

The Supreme Court in *Shea* attempted to reconcile the apparent differences in *United States* v. *Johnson* and *Solem* v. *Stumes*. The Court concluded that the "primary difference between *Johnson*, on the one hand, and *Stumes*, on the other, is the difference between a pending and undecided direct review of a judgment of conviction and a federal collateral attack upon a state conviction which has become final." The Court stated:

We now conclude, however, that there is no reason to reach in this case a result that is different from the one reached in *Johnson. See Mack* v. *Oklahoma*, 459 U.S. 900, 103 S.Ct. 201, 74 L.Ed.2d 161 (1982). There is nothing about a Fourth Amendment rule that suggests that in this context it should be given greater retroactive effect than a Fifth Amendment rule. Indeed, a Fifth Amendment violation may be more likely to effect the truth-finding process than a Fourth Amendment violation. And Justice Harlan's reasoning—that principled decision-making and fairness to similarly situated petitioners requires application of a new rule to all cases pending on direct review—is applicable with equal force to the situation presently before us. We hold that our analysis in *Johnson* is relevant for petitioner's direct-review Fifth Amendment claim under *Edwards*. He is entitled to the benefit of the ruling in that case.

*Id.* at 1070.

The Supreme Court then applied the principles set forth in *Johnson* and held that the *Edwards* rule would be applied to Shea's case since it was pending on direct review at the time of the *Edwards* decision.

Applying these principles to the present case, we must determine whether the rule in *Ake* pertaining to the appointment of a psychiatrist for an indigent defendant comes within an exception to the general rule on retroactivity announced in *Johnson* and *Shea* that all Supreme Court rulings will be applied to all cases still pending on direct review at the time of new rulings. One of the announced exceptions to the general rule on retroactivity is the case where the new ruling represents a "clear break with the

past."

At the time of appellant's trial, Code § 19.2-169.1 provided that "upon hearing evidence or representations of counsel, that there is probable cause to believe that the defendant lacks substantial capacity to understand the proceedings against him or to assist his attorney in his own defense, the court shall order that a competency evaluation be performed by at least one psychiatrist, clinical psychologist or master's level psychologist who is qualified by training and experience in forensic evaluation."[3] In compliance with this statute, both a licensed clinical psychologist with a Ph.D. degree in psychology and a master's level psychologist, both of whom were qualified by training and experience in forensic evaluation, evaluated the appellant and filed with the court a report of their findings. The report concluded that the appellant was falsifying symptoms of mental illness, that he was not mentally ill, and that he was a malingerer. The appellant does not contend that the trial court erred in administering Virginia law, nor has he contested the competency of the psychologists appointed by the court. Insofar as federal constitutional requirements were concerned, at the time this case was decided on October 25, 1984, a state was not required to furnish an indigent criminal defendant an independent psychiatrist. In *Smith* v. *Baldi*, 344 U.S. 561 (1953), the Supreme Court stated:

> This brings us to petitioner's second point: That the assistance of a psychiatrist was necessary to afford him adequate counsel. . . . Petitioner further asserts that he should have been given technical pretrial assistance by the State. Although the trial judge testified that defense counsel made no such request, petitioner here states that the trial court refused to appoint a psychiatrist to make a pretrial examination. We cannot say that the State has that duty by Constitutional mandate. *See McGarty* v. *O'Brien*, 188 F.2d 151, 155. As we have shown, the issue of petitioner's sanity was heard by the trial court. Psychiatrists testified. That suffices.

*Id.* at 568.

---

[3] Effective July 1, 1985, Code § 19.2-169.1 was amended.

The Fourth Circuit spoke clearly on the subject in the case of *Satterfield* v. *Zahradnick*, 572 F.2d 443 (4th Cir.), *cert. denied*, 436 U.S. 920 (1978), and stated:

> We first consider whether, in light of Virginia's statutory provision for committing a criminal defendant to a State mental facility for examination and observation, Va. Code Ann. § 19.1-228, a further Constitutional duty devolves upon the State to appoint a private psychiatrist at State expense for the benefit of indigent defendants. We cannot agree that such a duty exists. Whatever may be the extent of an indigent's right to an impartial psychiatric evaluation to enable him to place the issue of insanity before the trial court, *see United States ex rel. Smith* v. *Baldi*, 344 U.S. 561, 568, 73 S.Ct. 391, 97 L.Ed. 549 (1953), we are of opinion, on authority, that there exists no Constitutional right to the appointment of a private psychiatrist of the defendant's own choosing at public expense. *McGarty* v. *O'Brien*, 188 F.2d 151 (1st Cir. 1951); *see Proctor* v. *Harris*, 134 U.S. App.D.C. 109, 413 F.2d 383 (1969).

*Id.* at 445.

In *Finney* v. *Zant*, 709 F.2d 643 (11th Cir. 1983), *cert. denied*, 105 S.Ct. 1854 (1985), the Eleventh Circuit stated:

> In this case the trial court ordered that Finney be evaluated by psychiatric experts at the Central State Hospital. These experts testified at the trial and were subjected to cross-examination by Finney's attorneys. There is no indication in the record or assertion on appeal that defense counsel were denied access to the complete reports of the forensic team at the hospital. Finney's sanity was put in issue by competent evidence, and defense counsel were not deprived of expert opinion on the question. This is sufficient.

*Id.* at 645.

In *Mason* v. *Procunier*, 748 F.2d 852 (4th Cir. 1984), the Fourth Circuit reaffirmed its earlier rulings in *Satterfield* and stated:

*Smith* v. *Baldi*, 344 U.S. 561, 568, 73 S.Ct. 391, 394, 97 L.Ed. 549 (1953), holds that a state is not under a constitutional mandate to provide the defendant a psychiatrist. The court deems *Smith* v. *Baldi* to be the controlling precedent to which it must adhere.

*Id.* at 854.

In *McGarty* v. *O'Brien*, 188 F.2d 151 (1st Cir.), *cert. denied*, 341 U.S. 928 (1951), the First Circuit stated:

It turned out that the report in this case by Doctors Chambers and Dexter was not useful to the defense in establishing a legal defense of insanity, because of the conclusion which these impartial psychiatrists arrived at. But suppose the defense motion had been granted here, and assigned counsel had been authorized to employ two other experts to examine the accused: The two so chosen might, after examination of the defendant, have arrived at the same professional conclusion stated in the report of the psychiatrists designated by the Department of Mental Health. Would the defendant then be entitled to further financial assistance from the state to continue the search, merely because a defendant of ample private wealth would perhaps have been able eventually to find a more favorable psychiatrist somewhere in the United States, or even in Europe? We would think not; examination and report by two competent and impartial experts supplied at state expense is enough, we think, to satisfy the state's constitutional obligation under the due process clause. In the absence of some authoritative precedent to the contrary, we are unwilling to say, under all the circumstances here present, that the Superior Court's denial of the defense motion violated "a 'principal of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Bute* v. *Illinois*, 1948, 333 U.S. 640, 659, 68 S.Ct. 763, 773, 92 L.Ed. 986.

*Id.* at 157.

The Supreme Court of Virginia commented in *Tuggle* v. *Commonwealth*, 230 Va. 99, 334 S.E.2d 838 (1985), a case on remand

from the Supreme Court of the United States, that when the *Tuggle* case was decided in the Supreme Court of Virginia on November 30, 1984, "a state was not required to furnish a criminal defendant an independent psychiatrist. The Constitution required only that an accused's sanity be evaluated by a neutral examiner. . . . (citation omitted). In *Ake*, however, the Supreme Court recognized for the first time that, in certain circumstances, a state is constitutionally required to provide an indigent defendant with the assistance of a psychiatrist." *Id.* at 104, 334 S.E.2d at 840.

The language used in *Ake* itself recognizes changing circumstances and that the decision constitutes a clear break with past precedent. In discussing *Smith* v. *Baldi*, the Court stated:

> At most it supports the proposition that there is no constitutional right to more psychiatric assistance than the defendant in *Smith* had received.

> In any event, our disagreement with the State's reliance on *Smith* is more fundamental. That case was decided at a time when indigent defendants in state courts had no constitutional right to even the presence of counsel. Our recognition since then of elemental constitutional rights, each of which has enhanced the ability of an indigent defendant to attain a fair hearing, has signaled our increased commitment to assuring meaningful access to the judicial process. Also, neither trial practice nor legislative treatment of the role of insanity in the criminal process sits paralyzed simply because this court has once addressed them, and we would surely be remiss to ignore the extraordinarily enhanced role of psychiatry in criminal law today. Shifts in all these areas since the time of *Smith* convince us that the opinion in that case was addressed to altogether different variables, and that we are not limited by it in considering whether fundamental fairness today requires a different result.

*Ake*, 105 S.Ct. at 1098.

We recognize the "extraordinarily enhanced role of psychiatry" referred to in the *Ake* opinion, and that fundamental fairness today may require a result different from that required in *Smith* v. *Baldi*. We also recognize that at least since 1978 we have followed in this Commonwealth the decision of the Fourth Circuit in *Satterfield* v. *Zahradnick*, to the effect that there existed no constitutional right to the appointment of a private psychiatrist at public expense. At the time the robbery in this case was committed, Code § 19.2-167 provided that "[n]o person shall, while he is insane or feebleminded, be tried for a criminal offense." In compliance with Code §§ 19.2-169.1 and 19.2-169.5, the general district court ordered that an evaluation be made by the Rappahannock Area Mental Health Services to determine both the competency of the defendant to stand trial and the mental state of the defendant at the time of the offense and that a report be made to the court upon such evaluation. Similar statutes appeared in Virginia law as early as 1849. *See Shiflett* v. *Commonwealth*, 221 Va. 760, 766, 274 S.E.2d 305, 309 (1981). The courts of the Commonwealth and the law enforcement authorities have justifiably relied upon the old standards and procedures set forth in the statutes, which have uniformly been approved by the decisions of the federal courts. The practice for many years has been to appoint state psychiatrists and psychologists to make the evaluations required concerning the mental status of defendants at the time of the offense and at the time of the trial. For these reasons, we hold that *Ake* overrules decisions of both the federal and state courts, that the holdings in *Ake* could not have been clearly and distinctly foreshadowed or expected, and that *Ake* represents a "clear break" with past precedent and practice.

It is safe to say that a substantial percentage of the inmates in the Virginia prison system had mental evaluations performed upon them in state institutions by competent state-employed professional psychiatrists and psychologists. We know of no case in which these professional employees refused to cooperate with the defendants and to appear in court as witnesses. Indeed, the courts would have compelled such cooperation. If all of these persons whose convictions are final, or those that are not final and are yet on appeal, were to be granted new trials, it would place a heavy burden upon the courts and the law enforcement authorities. The appointment of defense psychiatrists would not enhance the accu-

racy of the fact-finding process because appropriate mental evaluations have already been made by competent persons at a time when the evaluation could accurately be made. The accuracy of a mental examination at this time to determine the competency of a defendant to stand trial or to determine the mental state of a defendant at the time of an offense that occurred a long time ago would be highly suspect.

We therefore hold that the rule announced in *Ake* should be applied only to those cases tried subsequent to February 26, 1985. Since this case was tried prior to that date, we hold that *Ake* has no application. Accordingly, because of the appellant's procedural default under Rule 5A:18, and in view of our ruling that *Ake* is not retroactive, we affirm.

*Affirmed.*

Duff, J., and Moon, J., concurred.